STATE of North Dakota, Plaintiff and Appellee,

v.

Richard HANSON, Defendant and Appellant.

Cr. No. 938.

Supreme Court of North Dakota.

Feb. 23, 1984.

Merle A. Torkelson, States Atty., Washburn, for plaintiff and appellee.

Ralph A. Vinje, Bismarck, for defendant and appellant.

ERICKSTAD, Chief Justice.

This is an appeal by the defendant, Richard D. Hanson, from a judgment of conviction entered by the County Court of McLean County on April 27, 1983, upon a jury verdict finding him guilty of the offense of driving while under the influence of intoxicating liquor in violation of Section 39–08–01, N.D.C.C. Hanson contends the trial court erred by admitting the results of a toxicological evaluation of a sample of his blood. He also contends the evidence was insufficient to establish that he was driving a vehicle. We affirm the conviction.

On February 5, 1983, at approximately 4:30 a.m., Officer Wayne Andersen of the North Dakota Highway Patrol received word of a motor vehicle accident north of Washburn, North Dakota, on State Highway 200. Officer Andersen testified that he was informed by an ambulance service, while en route to the scene of the accident, that there had occurred "a one vehicle rollover, one male subject injured at the scene and there were apparently no others," and that the injured person was going to be transported to a hospital in Turtle Lake, North Dakota. Officer Andersen arrived at the accident scene at 4:55 a.m., and found an unoccupied GMC pickup overturned in a ditch. Twelve to fourteen empty beer containers were scattered about the scene, including three empty beer bottles inside the pickup. The pickup was registered to the defendant, Richard Hanson. Officer Andersen testified that the parents of Richard Hanson arrived at the accident scene and told him that "they were the injured party's parents."

Officer Andersen then proceeded to the Turtle Lake Hospital, arriving at approximately 5:55 a.m., where he was met by McLean County Deputy Sheriff Scott Peterson. Deputy Peterson testified that he arrived at the hospital at 4:55 a.m., and was present shortly thereafter when an ambulance arrived with the injured Hanson. Deputy Peterson, after observing Hanson's behavior and noting slurred speech and an odor of alcohol, placed Hanson under arrest for driving while under the influence of intoxicating liquor. Officer Andersen testified that he also noticed a "moderate" odor of alcohol about Hanson, that Hanson's eyes were bloodshot, his pupils dilated and speech slurred. He described Hanson's attitude concerning the accident as "quite belligerent, obnoxious."

A blood sample was drawn from Hanson at the Turtle Lake Hospital. Officer Andersen mailed the sample to the Office of the State Toxicologist for chemical analysis. A certified copy of the analytical report of the blood analysis signed by the State Toxicologist was admitted at trial over the objection of Hanson's attorney. The analytical report indicated that a toxicological evaluation of the blood sample disclosed the presence of ethyl alcohol in the concentration of .11 percent by weight,

or .01 percent greater than the .10 percent required for a legal presumption of intoxication.

The State's case against Hanson consisted of testimony elicited from Officer Andersen, through whom was introduced the results of the blood-alcohol test, and Deputy Peterson. Two ambulance attendants who transported Hanson to the hospital were called as witnesses by Hanson's attorney. Attendant Teroy Repnow testified that Hanson was picked up at a residence referred to as the "Sayler house" at approximately 2:30–3:00 a.m. The other ambulance attendant, Tom Repnow, testified that he found Hanson in the house lying on a blanket on the floor of the living room. Both attendants testified that they did not observe anything that indicated Hanson was intoxicated.

Hanson was found guilty by a jury of six persons and sentenced by the county court to 30 days imprisonment in the county jail which sentence was suspended on the condition that he pay a fine of $150, costs of prosecution of $150 and that he commit no criminal violations for a period of one year.

Hanson contends the trial court erred in admitting the results of the blood-alcohol test for two reasons:

1. A proper foundation was not established for admitting the results of the blood-alcohol test because the qualifications of the individual who drew the blood sample were not shown to conform to Section 39–20–02, N.D.C.C., by admissible evidence; nor was the individual present to testify concerning whether or not the withdrawal of the blood sample was "fairly administered."

2. The certified copy of the analytical report of the blood analysis signed by the state toxicologist did not indicate that the percent by weight of alcohol in the blood was "based upon grams of alcohol per one hundred cubic centimeters of blood" pursuant to the language of Section 39–20–07(4), N.D.C.C.

Hanson contends that there was insufficient evidence presented, if the results of the blood-alcohol test were excluded, to prove that he was under the influence of intoxicating liquor. He also asserts there was insufficient evidence presented to prove that he was driving a vehicle.

This case occurred prior to the effective date of revisions made by the 1983 Legislative Assembly to North Dakota laws relating to the operation of a vehicle while under the influence of intoxicating liquor. Prior statutory authority applicable to this case provided in part as follows:

"39–08–01. *Persons under the influence of intoxicating liquor or controlled substances not to operate vehicle—Penalty.*

"1. No person shall drive or be in actual physical control of any vehicle upon a highway or upon public or private areas to which the public has a right to access for vehicular use in this state if:

. . .

·b. He is under the influence of intoxicating liquor; ..."

"39–20–02. *Persons qualified to administer test.* Only a physician, or a qualified technician, chemist, or registered nurse acting at the request of a law enforcement officer may withdraw blood for purpose of determining the alcoholic content therein.... Upon the request of the person who is tested, full information concerning the test or tests taken at the direction of the law enforcement officer shall be made available to him."

"39–20–07. *Interpretation of chemical tests.* Upon the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person while driving or in actual physical control of a motor vehicle while under the influence of intoxicating liquor, evidence of the amount of alcohol in the person's blood at the time of the act alleged as shown by a chemical analysis of his blood, breath, saliva or urine is admissible. For the purpose of this section:

\*     \*     \*     \*     \*     \*

3. A person having, at that time, ten-hundredths of one percent or more by weight of alcohol in his blood shall be

presumed to be under the influence of intoxicating liquor.

4. Percent by weight of alcohol in the blood shall be based upon grams of alcohol per one hundred cubic centimeters of blood.

\* \* \* \* \* \*

6. A certified copy of the analytical report of a blood analysis signed by the state toxicologist shall be accepted as prima facie evidence of the results of such a chemical analysis performed herein."

### Admissibility of the Analytical Report

The person who drew the blood sample from Hanson was not present at trial to testify. Instead, the State elicited the following testimony from Officer Andersen:

"Q. Was a blood test then taken or blood sample taken?

"A. After he immediately made contact with a lawyer, yes one was taken.

"Q. Were you present at the time that it was taken?

"A. Yes, I was.

"Q. Would you describe the situation as it was taken, was it a hospital room and laboratory conditions?

"A. It was in a hospital emergency room at Turtle Lake, under very sterile, clean conditions.

"Q. Who took the blood sample?

"A. The registered nurse on duty took—

"MR. VINJE: Objection to that as being a conclusion on a lack of foundation for the conclusion drawn.

"THE COURT: Overruled.

"MS. TORKELSON CONTINUES:

"Q. Who took the blood sample?

"A. The registered nurse on duty at that time.

"Q. Do you recall what her name was?

"A. No, I do not."

Defense counsel later objected to the introduction of the analytical report on grounds there was an insufficient foundation laid concerning whether or not the individual who drew the blood sample was a registered nurse. The trial court sustained the objection. Additional testimony from Officer Andersen was then heard:

"Q. Officer Andersen, I'm going to back up a little bit to the testimony earlier about the registered nurse taking the blood sample, how do you know she was a registered nurse?

"A. She was wearing the name tag which gave her name and the RN behind it and then I asked her if she was a registered—

"MR. VINJE: I object to that being hearsay. I object to both the tag and the statement of the individual he refers to.

"THE COURT: Overruled.

"MS. TORKELSON CONTINUES:

"Q. Go on, Officer Andersen.

"A. By her name tag and conversing she did state.

"Q. Can you describe what she was wearing?

"A. A totally white uniform and white shoes, hospital uniform."

The trial court then admitted the analytical report "on the basis that [Officer Andersen] made a determination that she was a registered nurse, that he is capable of observing it and making a determination ... based upon the entire procedure, from the function that she performed, from her appearance, from her name tag." The trial court concluded the evidence was sufficient to establish that the blood sample was drawn by a registered nurse.

■ Hanson argues that Officer Andersen's testimony to the effect that the registered nurse on duty took the blood sample was hearsay, and therefore inadmissible to prove the person was authorized by Section 39–20–02 to withdraw blood for the purpose of determining the alcoholic content therein.

It is true that portions of Officer Andersen's testimony concerning the basis for his conclusion that the person who drew the blood sample was a registered nurse were hearsay. Hanson does not dispute the fact, however, that Officer Andersen was present when the blood sample was taken in the emergency room of the hospital.

Officer Andersen had personal knowledge of the circumstances surrounding the drawing of the blood sample.[1] The inference drawn by Officer Andersen that the individual who withdrew the blood was a registered nurse was rationally based upon his perception of events which took place at the hospital. *See Harbin v. City of Huntsville*, 333 So.2d 625, 626–27 (Ala.Cr.App. 1976) [Under a similar statute, officer's testimony was sufficient evidence to support inference that person who drew blood sample was a registered nurse; officer testified that blood drawer "had on 'a white uniform with a name tag on as a Registered Nurse'"]. We conclude the trial court did not abuse its discretion in ruling that Officer Andersen's testimony constituted sufficient evidence to establish that the person who drew the blood sample was a registered nurse.[2]

■ Hanson asserts he did not have an opportunity to examine the person who drew the blood sample to determine if "the test was fairly administered." He argues that he was not able to ascertain if the blood sample was drawn with a non-sterile syringe or if his arm was swabbed with alcohol prior to the blood being drawn.

Our case law recognizes the possibility that a blood sample may become contaminated before it reaches the laboratory for chemical analysis. *See Wanna v. Miller*, 136 N.W.2d 563 (N.D.1965); *Erickson v. North Dakota Workmen's Compensation Bureau*, 123 N.W.2d 292 (N.D.1963). In *Wanna v. Miller, supra,* the plaintiff sued the owner of a tavern under the Dram Shop Act for serving liquor to an intoxicated customer who later was involved in an automobile collision with the plaintiff. The State Toxicologist testified at trial concerning the results of a chemical analysis of a blood sample taken from the customer. In

response to the defendant's contention that there was no foundation for the State Toxicologist's testimony and that the blood sample "was not administered as directed by law pursuant to Chapter 39–20," we said:

"The blood specimen was extracted from [the customer's] vein near the elbow by ... an x-ray technician and assistant laboratory technician at the Good Samaritan Hospital at Rugby. Although he did not remember specifically taking the specimen of blood, he said that he had checked the hospital records and found that he had done so. He explained the usual procedure by which blood for this purpose is extracted, marked, and mailed to the State Toxicologist. *The procedure appeared proper, and our attention has not been drawn to any irregularity. The extraction of blood having been voluntary and proper safeguards having been taken in the extraction, marking, handling, mailing, receiving, and analysis of the specimen,* we find no merit in the objection of no foundation for [the State Toxicologist's] testimony in regard to the alcohol content of the specimen...." [Emphasis added.] 136 N.W.2d at 570.

Officer Andersen testified that the blood sample was withdrawn from Hanson under very clean and sterile conditions. He testified further as to the procedures utilized in the handling and mailing of the blood sample to the Office of the State Toxicologist. We believe there were sufficient indicia of reliability in the withdrawal of the blood sample in this case so as to permit the receipt of the results of the blood-alcohol test. There is no doubt the restrictive provision of Section 39–20–02, limiting the procurement of blood samples to certain quali-

---

1. Rule 602, N.D.R.Ev., reads in pertinent part as follows:

    "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness himself."

2. Hanson was entitled, upon request, to "full information" concerning the test taken at the

direction of Officer Andersen. Section 39–20–02, N.D.C.C. This information should include the identity and qualifications of the person who drew the blood sample for the purpose of chemical analysis. Hanson does not contend that the person who drew the blood sample was not a registered nurse and apparently has obtained no information to that effect.

fied persons, serves to protect not only the health of the person from whom the blood sample is taken but also the reliability of the blood sample itself. The blood sample was drawn in a hospital environment by a registered nurse. There is nothing in the record to indicate and no argument is made by the defendant that it was improperly performed.

When the results of the blood-alcohol test were offered, the only objection made by the defendant was that there was no showing the sample was drawn by a registered nurse. On appeal, the defendant adds to his assertion that proof is lacking that the nurse was registered to suggest that the blood sample might have been drawn with a non-sterile needle or that alcohol might have been used to swab his arm. We do not believe bare speculation is sufficient to destroy the integrity of the blood sample. There is no suggestion that anyone tampered with the sample or that the chain of custody was not established. *See Erickson v. North Dakota Workmen's Compensation Bureau, supra,* 123 N.W.2d at 295–96 [Evidence of alcohol content of blood in workmen's compensation proceeding properly excluded where blood sample was not shown to be in substantially the same condition at the time the blood analysis was performed as it was when the blood was drawn]. Under the circumstances of the instant case, the State established adequate proof of the reliability of the blood sample.

The analytical report indicated that Hanson's blood sample contained alcohol in the concentration of .11 percent "by weight." Hanson contends an insufficient foundation was laid for admitting the results of the blood-alcohol test because there was no showing this measurement was based on grams of alcohol per one hundred cubic centimeters of blood.

■ It is true Section 39–20–07(4), N.D.C.C., requires that "[p]ercent by weight of alcohol in the blood shall be based upon grams of alcohol per one hundred cubic centimeters of blood." There is no statutory provision requiring, however, that such language be incorporated into the analytical report. The certified copy of the analytical report signed by the State Toxicologist was prima facie evidence of the results of the *chemical analysis* of the sample. Section 39–20–07(6), N.D.C.C. It can be assumed, when there is no evidence to the contrary, that the chemical analysis was performed according to the law. Section 31–11–03(32), N.D.C.C. In *State v. Erickson,* 241 N.W.2d 854, 865 (N.D.1976), we said that a laboratory technician performing a service under the supervision and direction of the State Toxicologist is performing an official act which is entitled to a disputable presumption of regularity pursuant to Section 31–11–03(15), N.D.C.C.

■ Hanson did not subpoena the State Toxicologist or any of his employees for examination at trial to determine compliance with Section 39–20–07(4). This he had a right to do at no cost to himself pursuant to Section 39–20–07(7).[3] No contradictory evidence was introduced to rebut the presumption that the .11 percent by weight result of the chemical analysis of the blood sample was based upon grams of alcohol per one hundred cubic centimeters of blood. Accordingly, the presumption stands.

### Driving Element

■ In *State v. Fuchs,* 219 N.W.2d 842, 844 (N.D.1974), we said that the driving element of Section 39–08–01, N.D.C.C., may be established by circumstantial evidence. Hanson contends the circumstantial evidence produced at trial was insufficient to support a conclusion that he was driving a vehicle. Our role in reviewing convictions based on circumstantial evidence is well settled:

"[A]t the trial level, circumstantial evidence must be conclusive and must exclude every reasonable hypothesis of in-

---

**3.** Section 39–20–07(7), N.D.C.C., provided as follows:

"Notwithstanding any statute or rule to the contrary, the defendant may subpoena the state toxicologist or any employee thereof to testify at the trial of the issue at no cost to the defendant."

nocence, but on the appellate court level the role of the Supreme Court is merely to review the record to determine if there is competent evidence that allows the jury to draw an inference reasonably tending to prove guilt, and fairly warranting a conviction. *State v. McMorrow,* 286 N.W.2d 284, 287 (N.D.1979); *State v. Schuler,* 243 N.W.2d 367, 371 (N.D.1976); *State v. Allen,* 237 N.W.2d 154, 161 (N.D.1975)." *State v. Hilsman,* 333 N.W.2d 411, 414 (N.D.1983).

Considering the evidence in this case in a light most favorable to the verdict, we find substantial evidence exists to support Hanson's conviction for driving a vehicle while intoxicated. Officer Andersen testified, utilizing photographs of the scene of the accident depicting tire tracks left by the pickup in the snow-covered ditch, that the driver and pickup, traveling east, entered the ditch from the westbound lane of the highway. The pickup was registered to Hanson. Officer Andersen was informed that "one male subject was injured" in the accident. Hanson's parents told Officer Andersen that they were the parents of the injured party. Hanson was apparently injured. Deputy Peterson observed the ambulance arrive at the hospital with Hanson. There was no evidence that anyone else drove the vehicle or was seen in the vicinity at the crucial time.

Accordingly, the judgment of conviction is affirmed.

VANDE WALLE, PEDERSON, GIERKE and SAND, JJ., concur.